**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Case No. 15 - cr - 00303 RBJ

UNITED STATES OF AMERICA,

    Plaintiff,

v.

    1.    THOMAS FORSTER GEHRMANN, JR.,

    Defendant.

**SENTENCING MEMORANDUM AND MOTION FOR A VARIANT SENTENCE**

Mr. Thomas Forster Gehrmann Jr, through counsel Patrick Ridley and Kristen Frost of the law firm of Ridley, McGreevy & Winocur, P.C., respectfully submits his sentencing memorandum based on 18 U.S.C. § 3553(a) and his motion for a variant sentence. In support thereof, Mr. Gehrmann states as follows:

**Introduction**

In determining an appropriate sentence, this Court must consider the guideline range and the statutory factors under 18 U.S.C. § 3553(a) that apply to the individual circumstances related to a particular defendant. This Court is empowered to consider all of the characteristics of the offender and circumstances of the offense to impose a sentence that is sufficient but not greater than necessary to satisfy the purposes of sentencing. *Rita v. United States*, 551 U.S. 338 (2007); *Gall v. United States*, 552 U.S. 38 (2007); *Kimbrough v. United States*, 552 U.S. 85 (2007). Judges "may vary [from Guidelines ranges] based solely on policy considerations, including disagreement with the

Sentencing Guidelines." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (internal quotation marks omitted).  After calculating and considering the advice of the guidelines, this Court must then turn to an "individualized assessment" of the case "based on the facts presented."  *Gall,* 552 U.S. at 597.  That assessment must be conducted within the mandatory framework of 18 U.S.C. § 3553(a).

## The 18 U.S.C. § 3553(a) Factors Support A Non-Custodial Sentence Of Probation

Under 18 U.S.C. § 3553(a), a variant sentence will be "sufficient, but not greater than necessary" to comply with the purposes set forth under Section 3553(a).  A non-custodial sentence of probation is warranted in this case because of factors which will be discussed below, all of which are highly relevant to the purposes of sentencing and none of which is taken into account by the guideline range.

### 1. The History And Characteristics Of The Defendant

This is Mr. Gehrmann's first criminal conviction.  Mr. Gehrmann is now 45 years old, and during the charged time frame at issue in this case (2007-2010), he was 34-37 years old.  By 2007, Mr. Gehrmann had married his wife Kelly, had two daughters, lost one child and was essentially working two jobs to support his family: as a chiropractor at Atlas Chiropractic ("Atlas") and in various capacities at Rotellis.  In investing in Rotellis franchises, Mr. Gehrmann had a sincere belief that it was a valuable investment opportunity that would help him provide for his wife and young children, and would support Mrs. Gehrmann's desire to quit work and be a stay-at-home mom.  Unfortunately for the Gehrmanns, the Rotellis endeavor went south, became a time-consuming and financial nightmare, and they are still paying for it today.  From 2007-2010, Mr. Gehrmann was the

partner responsible for marketing and business development at Atlas.  Dr. Carlson was the partner who handled all of the financials for Atlas during that time frame.

As a whole, Mr. Gehrmann has lived a productive, charitable and law-abiding life.  As demonstrated by the numerous letters submitted in support of Mr. Gehrmann, he is someone who has prioritized helping others in both a professional and personal capacity.  [Docs. 176, 179].  He is a dedicated father and husband, and a family man in all regards.  *Id.*  When this case began for Mr. Gehrmann back in 2011 after the raid at Atlas, his daughters were in kindergarten and second grade.  They are now in seventh grade and high school.  He has helped countless people in his work as both a chiropractor and as a financial advisor.  [Docs. 176-2, 4; Doc. 179-1-4].  He mentored employees at Atlas and the Atlas employees looked up to him and respected him.  [Doc. 176-2].

Mr. Gehrmann obtained his undergraduate degree from Villanova University and then obtained his doctorate degree in chiropractic medicine from Life Chiropractic University.  Mr. Gehrmann had aspired to be a chiropractor since he was young.  When Mr. Gehrmann was around eight years old, he suffered from bad headaches and saw a chiropractor who alleviated that problem for him and changed his life.  [T. Gehrmann Tr. at 6].  Since that time, Mr. Gehrmann made it his goal to become a chiropractor because he respected the doctor who cured him and that particular field of medicine, and wanted to help others in the same way.  One great example is Carma McConahay's story about how Mr. Gehrmann's treatment saved her from being wheel chair bound.  [Doc. 176-4].  Bill Walton notes how Mr. Gehrmann brought this same type of dedication and care to his clients in the financial services industry, and would also refer to clients as "patients."  [Doc. 179-1].

Mr. Gehrmann also has been a consistently hard-working man for his entire life, and with the exception of the years at issue in this case, has paid all taxes on his income. Before starting his own practice with Dr. Carlson, Mr. Gehrmann worked for another chiropractic practice and worked numerous jobs, such as a caddie and waiter, as he made his way through school.  Mr. Gehrmann is not someone who does not believe in paying taxes for any type of political or ideological reason or who does not believe in paying taxes for any reason.  Mr. Gehrmann did pay taxes during the years at issue here, however, the information on the returns was incorrect and he did not pay all of the taxes that he owed. He is remorseful for that and regrets that time of his life.  Mr. Gehrmann has paid substantial taxes to the IRS since the charged time frame. From 2012-2018, Mr. Gehrmann has paid approximately $651,839 in taxes.  Ex. D.

Mr. Gehrmann has been a caretaker for his mother Penny, and if he is able to, will continue in that role to the best of his ability.  [Doc. 176-1].  As demonstrated by the numerous mitigation letters as well as the character witnesses who testified at trial, Mr. Gehrmann is loved and respected by many and has, in turn, positively impacted the lives of many individuals who have crossed his path.  Out of the many people in that group, it cannot be understated how much Mrs. Gehrmann and their daughters love, support and need Mr. Gehrmann in their lives.  Mr. Gehrmann eventually had to tell his daughters about this case, which was a difficult task.  Mrs. Gehrmann and his daughters stand by him through this process.

Mr. Gehrmann has also accepted responsibility from the beginning and has repeatedly attempted to pay the IRS back for the money that he owes.  As the Court is aware, this case began as a joint DOL/IRS investigation and the main thrust of it was for

alleged medical care fraud allegations against Dr. Carlson – not Mr. Gehrmann. The government never found evidence to substantiate a medical care fraud case against Dr. Carlson. After that point in time, this turned into a tax case. After the raid, Mr. Gehrmann took over the financials at Atlas, worked with Cindy Proffitt and changed the way things were done at Atlas. Eventually, he also retained counsel and tried to negotiate a pre-indictment resolution of the case in order to accept responsibility, pay the IRS back and settle the matter. During negotiations after the criminal case was filed, he was willing to pay the IRS back in exchange for a plea bargain that would preserve his ability to work but such an offer was never extended. For years now, he has spent significant time and resources in engaging counsel to assist in resolving this case. Despite his best efforts, a pre-trial resolution did not occur.

**2. The Nature And Circumstances Of The Offense**

In comparison to other tax cases, the tax loss to the IRS in this case is relatively low, and until recently, the government has avoided referencing these low numbers. During trial, for instance, the government did not want the jury to know the loss amount to the IRS. When Probation filed its Pre-sentence Investigation Report ("PSI"), the report indicated that the government communicated that it intended on relying upon estimates to establish loss at sentencing. [Doc. 177, ¶ 14]. Shortly before the initial sentencing date, on February 25, 2019, the government provided the defense with exhibits that include actual figures, as opposed to estimates, to establish purported loss for sentencing. Ex. A, B.

One exhibit includes the government's tax loss trial numbers for all defendants for tax due and owing. These trial numbers do not include any purported improper expenses

and provides a total of $112,092 for all three defendants from 2004-2010. Ex. A.[1] Another exhibit includes significantly higher numbers because the government is now claiming the loss amount should include years of allegedly improper expenses. Ex. B. This second new loss calculation more than doubles the trial loss amount and the government is claiming that with expenses the loss amount is actually $250,356.[2] *Id.* The defense objects to this inflated number that includes allegedly improper expenses and disallows routine deductions such as standard personal deductions and child care credits. The defense maintains that the loss amount, and resulting base offense level is either 14, or at most 16.

### A. Any Alleged Loss Attributable To Any Defendant For 2004 Should Not Be Included In The Loss Amount.

For the reasons stated in Mr. Gehrmann's objections to the PSI, any purported loss in 2004 should not be included in the loss calculation for sentencing because the government withdrew its request to admit this evidence at trial, waived this claim and does not have reliable evidence for 2004. [Doc. 183, p. 7-10]. The government's new exhibits that have recently been produced further that argument, as it admits it could not locate Mr. Gehrmann's original 2004 Form 1040. This is why the box is blank in the government's

---

[1] For ease of discussion, the defense will use the government's summary chart and trial numbers the defense received on February 25, 2019, because the defense and government numbers are not too far off in this context. Before receiving the new information from the government, the defense previously submitted its loss numbers which totaled $90,658 based on the information it had at the time. [Doc. 183-1, Ex. A]. That calculation only included the amount of loss listed in Dr. Davis' plea agreement. The government's new exhibits include additional loss attributable to Dr. Davis from his tax returns, which is outside of his plea agreement, that accounts for its higher total number of $112,092.

[2] In arguing that the loss should be $250,356, the government is attempting to raise the base offense level another level to 18 under the tax table in USSG §2T4.1 by $356. USSG §2T4.1 (providing for a base offense level of 16 for loss of more than $100,000 to $250,000, and 18 for more than $250,000).

exhibit for 2004 in Mr. Gehrmann's column and does not include any loss amount. Ex. A. Thus, the government cannot prove any individual loss amount for Mr. Gehrmann in 2004.

### B. Any Loss Attributable To Mr. Gehrmann From 2004-2006 Should Be Based On His Individual Tax Liability Alone.

The government has included individual loss attributable to Dr. Carlson for the years 2004-2006 in its calculation of loss for Mr. Gehrmann. Ex. A. The government is unfairly stretching to make the loss as large as possible. Any loss attributable to Dr. Carlson from 2004-2006 is his individual loss and his responsibility alone. According to the government chart, this amount is $33,906. *Id.* The government cannot prove that Mr. Gehrmann should be held responsible for this $33,906 because he was not part of any conspiracy and is not relevant conduct under USSG § 1B1.3.

First, there is no evidence to substantiate any conspiracy during 2004-2006. These years pre-date the charged conspiracy. There was little to no trial testimony about these years, except for some general background provided by Mr. Gehrmann. The government did not admit tax returns from 2004. There was little to no testimony about the returns from 2005-2006 that were admitted. There was no cookie jar or records book from 2005-2006. The government did not produce testimony from the Atlas bookkeeper or CPA who prepared the returns during these years, but instead presented testimony from Ms. Proffitt and Tom O'Neal who were involved in 2007 and onwards. The government's main evidence of conspiracy, Dr. Davis, had no knowledge and nothing relevant to say about 2005-2006, because he did not become a partner at Atlas until 2007. Thus, there is no proof at all to substantiate that loss from 2004-2006 was part of any conspiracy.

Second, and for those same reasons, it is not relevant conduct under USSG § 1B1.3(a)(1)(B) which permits a defendant to be sentenced for acts committed by others

7

during the course of jointly undertaken criminal activities when those acts were in furtherance of the activity and reasonably foreseeable. Conduct can only be considered relevant conduct if all three prongs under section (a)(1)(B) are satisfied. USSG § 1B1.3, comment (n. 3(A)). As stated above, there is no evidence for the years of 2004-2006 that establishes any of these three prongs. Thus, any purported loss from 2004-2006 is not relevant conduct and should not be included as loss.

### C. The Government's Alleged Improper Expenses And/Or Deductions Should Not Be Included As Loss.

In its most recent exhibits, the government improperly includes loss for numerous years from 2004 onwards of "credit card expenses with the appearance of personal expenses," to the tune of over $130,000. Ex. B.[3] This is another example of overreaching to make the loss amount appear as high as possible, even though in reality it is relatively low. The government has no proof that these expenses are improper and constitute loss for purposes of sentencing. The government and defense recently met about this issue and are currently in discussions about whether a stipulation can be reached regarding the existence of any alleged improper expenses and, if they do exist, what that amount should be. However, in the event an agreement cannot be reached, the defense objects to any expenses being included as loss based on the following points.

The government's review of Atlas credit card statements does not constitute proof that any expenses were fraudulent or improper. The government does not even have credit card statements from 2004, and its figure related to this year is just an arbitrary estimate based on other years. Agent Smith reviewed Atlas statements from 2005-2010, and has arbitrarily selected charges on the card that she deems to have the "appearance"

---

[3] The difference between the trial loss of $112,092 in Ex. A, and the $250,356 listed in Ex. B, is the allegedly improper expenses.

8

of being disallowed without doing any type of verification or review of actual receipts related to those charges. For example, Agent Smith has included *inter alia* charges for gas, meals, nominal charges at 7-11, and purchases at stores like Target and Lowes. The government has no idea what was purchased, why any items were purchased, or why any meal or gas was purchased. It is operating on assumptions and speculation without proof, in order to up the ante, and cannot prove that any charge was improper. Agent Smith's trial testimony further illustrates this point, because she generally insinuated that she believed certain business expenses could have been improper but her analysis nonetheless included the expenses at face value. [Smith Tr. at 32, 58]. Agent Smith only discussed a small handful of credit card expenses and vehicle related expenses that she claimed may have been improper. *Id.* at 32-40; 65-75. On cross-examination, she admitted that she had not reviewed any receipts for any purchases on the credit card and was assuming certain facts related to how Mr. Gehrmann used his vehicle. *Id.* at 65-75.

Further, the testimony of Mr. and Mrs. Gehrmann do nothing to further the government's claim. Mrs. Gehrmann did not testify about any charges on the Atlas credit card, and explained that Mr. Gehrmann used their car for work and kept a table in it because he travelled to see patients. [K. Gehrmann Tr., at 36-37]. She testified briefly about a personal credit card, a few Atlas checks of nominal amounts and that she may have gone to a Broncos game with Mr. Gehrmann in 2010. *Id.* at 13, 16, 22-24, 27. Mr. Gehrmann also explained his work use of the car, and that the expenses he was confronted with were all for work and business development purposes. [T. Gehrmann Tr., at 39-47, 58, 78-81, 93, 98]. Therefore, none of the trial testimony supports the

government's new argument that over $130,000 in expenses and deductions were improper and should now be included as loss.

Because the government has no proof that any expense or deduction was improper, the Court should not include any of the figures in Exhibit B in determining loss if the parties do not reach an agreement on this issue before sentencing.

### 3. The Purposes Of Sentencing

Under 18 U.S.C. §3553(a)(2), a defendant's sentence should be designed:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

None of these factors support a prison sentence and instead weigh in favor of a non-custodial sentence to probation. Mr. Gehrmann has no criminal history, is not a violent man, and does not pose a threat to the public and there is no need to protect the public from anything he does. To the contrary, he has spent many years of his life caring for the public. There are no members of the public that are victims in this case. Thus, protecting the public is not a factor that has any applicability here.

Likewise, deterrence is not a factor that weighs in favor of a prison sentence in this case. This underlying conduct in this case occurred numerous years ago. The majority of the conspiracy time frame is over ten years old. Atlas was raided in September of 2011, and Mr. Gehrmann was not indicted until 2015. Since 2011, and throughout the last eight years, Mr. Gehrmann has not committed any other offenses. He has been in compliance with pre-trial services, has appeared at every court date and has never violated the conditions of his release. Since 2011, Mr. Gehrmann has paid an enormous amount of

money to the IRS, because he owed that money to the IRS. Mr. Gehrmann's adherence to the law and payment of taxes shows he is not someone that needs to be made an example of in terms of deterrence.  His payment of substantial taxes for the last eight years also demonstrates that he has no intention of underpaying taxes again, is motivated to ensure that his tax returns are accurate and that this will never happen again.

Empirical research shows no relationship between sentence length and deterrence. The general research finding is that "deterrence works," in the sense that there is less crime with a criminal justice system than there would be without one.  In one study, which involved federal white collar offenders in the pre-guideline era, no difference in deterrence was found even between probation and imprisonment. *See* David Weisburd *et.al., Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 Criminology 587 (1995).  "[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders."  Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 448–498 (2007). Balancing this ineffectiveness against the financial costs to society of imprisoning an individual ($36,300 per year), should lead this Court to conclude that deterrence does not weigh in favor of the use of government money to fund a custodial sentence here.

Just punishment also weighs in favor of a probationary sentence.  Mr. Gehrmann has already been punished for years in an emotional, financial and practical sense.  The investigation and prosecution of this case has been a daunting reality in Mr. Gehrmann's life for eight years.   The accompanying stress, pressure and fear have also weighed on him, and his family, for that same amount of time.  Although it is hard to put into words how

these realities constitute their own type of punishment, they do. One good example is the local media attention that Mr. Gehrmann and his family have experienced at time. After the raid, the Gehrmanns downsized their home and transferred their daughters into a different school, which was a smaller, parochial school where they felt the girls would receive less attention. The more recent media attention after Mr. Gehrmann's conviction also had a negative impact.

Also, Mr. Gehrmann has paid a steep financial cost in paying to defend himself for this long time, including defending himself on appeal. Despite the fact that Mr. Gehrmann earned a good living, the significant costs of defense has been significant a burden. Mr. Gehrmann will continue to be financially punished due to his conviction because he has lost his ability to work. Mr. Gehrmann was regulated by the Securities Exchange Commission as a financial advisor and upon sentencing will have to surrender his license. Accelerated Wealth already had to reluctantly let him go.

Because Mr. Gehrmann has already been punished in many ways, for many years, punishment in the form of incarceration is overly-punitive and unwarranted based on the facts of this case and his individual characteristics and circumstances.

**4. The Kind Of Sentences Available**

Prison is not mandatory in this case and is not the only sentence available.[4] A non-prison sentence, in the form of probation and/or in home confinement is an available sentence. The counts of conviction are Class D and Class E felonies. Therefore, the provisions of 18 U.S.C. § 3561 do not prohibit a probationary sentence. *See* U.S.S.G. §

---

[4] The PSI incorrectly states that probation is not possible because the applicable guideline range is in Zone D, and cites to U.S.S.G. §5B1.1. [Doc. 177, ¶113]. This statement overlooks the fact that the sentencing guidelines are advisory, *United States v. Booker,* 540 U.S. 220 (2005), and the statutory applicable language permits probation.

5B1.1 comment n.2. This Court has the authority to grant a probationary sentence in compliance with the provisions of 18 U.S.C. § 3561. *See United States v. Booker,* 540 U.S. 220 (2005). If the Court imposes a sentence of imprisonment, however, a variant sentence well below the guidelines is an appropriate prison sentence.

### 5. The Need To Avoid Unwanted Sentencing Disparities

The need to avoid sentencing disparities supports a probationary sentence in this case. Dr. Davis is currently serving a probationary sentence, and Probation has recommended a probationary sentence for Dr. Carlson. Although both of them pled guilty in this case, Mr. Gehrmann should not be punished for exercising his right to trial. He deserves a probationary sentence commensurate with the sentences of his co-defendants, assuming Dr. Carlson receives a probationary sentence, because of the nature and circumstances of his life over the last eight years, which stands in contrast to that of his co-defendants.

Since the raid, Mr. Gehrmann has not had any problems with the law and has not had financial or tax problems. Unlike Dr. Carlson, who was charged in another federal case since this one (Case No. 18-cr-210-RBJ) and filed a false return in 2013 and failed to file one at all in 2014, Mr. Gehrmann has paid over $650,000 in taxes since 2012. Aside from this case, he has not engaged in any illegal or questionable conduct.

Dr. Davis, upon information and belief, has been engaged in his own mischief since he decided to cooperate in this case in 2014. Dr. Davis borrowed money from an Atlas therapist employee who made substantially less money than him, which he admitted to at trial [Davis Tr., at 68], and still has yet to pay her back. More recently, defense investigation reveals that Dr. Davis has engaged in financial impropriety at Atlas, long after

Mr. Gehrmann left. Dr. Davis has taken out high-interest loans, had problems with payroll taxes and was often, if not always, taking daily draws from Atlas that were unjustified. Therefore, in terms of lifestyle and law-abiding conduct over the last several years, Mr. Gehrmann stands in a class apart from his co-defendants and if his co-defendants receive a probationary sentence in this case, so should he.

Sentences rendered in other tax cases nationwide also demonstrate that probation is a common sentence in tax cases and that any disparity with that trend does not make sense here. This is especially the case where defendants convicted of more serious tax crimes, with a much more significant loss than at issue here, and with backgrounds similar to Mr. Gehrmann, have received sentences of probation. Ex. C.

Further, a probationary sentence in this case can even be viewed as greater punishment than is typically imposed on individuals who engage in similar conduct whose underpaid taxes are addressed through civil fines or penalties. Oftentimes, the IRS does not criminally prosecute cases where the loss numbers are on the lower side and instead pursues a civil case. Mr. Gehrmann had hoped this would happen, attempted to make it happen and offered to pay the government back, but the government chose to prosecute him. Therefore, a prison sentence of any kind would put Mr. Gehrmann in a completely different ballpark than similarly situated individuals who owe the IRS around the same amount of money, but who have settled claims through the civil process and have not been prosecuted.

### 6. The Need To Provide Restitution

Mr. Gehrmann is more than willing to pay the IRS back for the actual loss he caused and wants to make the IRS whole for what he really owes. However, depending

on what occurs at sentencing, Mr. Gehrmann reserves his right to contest any restitution and his right to a restitution hearing.

## Conclusion

Mr. Gehrmann respectfully moves this Court to impose a variant sentence of probation based on all of the factors set forth in 18 U.S.C. §3553(a) as provided above.

Respectfully submitted this 21st day of March, 2019.

*/s/ Kristen M. Frost*
Kristen M. Frost, No. 37685
Patrick L. Ridley, No. 17022
Ridley, McGreevy & Winocur, P.C.
303 16th Street, Suite 200
Denver, Colorado  80202
Telephone: (303) 629-9700
Fax:  (303) 629-8702
Email frost@ridleylaw.com
         ridley@ridleylaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of March, 2019, I served a true and correct copy of the foregoing **SENTENCING MEMORANDUM AND MOTION FOR A VARIANT SENTENCE** electronically with the clerk of the court via the CM/ECF system to all interested parties:

U.S. Attorney's Office-Denver
1801 California Street Suite 1600
Denver, CO 80202
Email:  Suneeta.Hazra@usdoj.gov
*Federal Agency Attorney*

 

*s/Heather Grant*
Heather Grant, Legal Secretary
Ridley, McGreevy & Winocur
303 16th Street Suite 200
Denver CO 80202
Telephone: (303) 629-9700
Facsimile: (303) 629-9702
Email: grant@ridleylaw.com